12-1666 MOTOROLA MOBILITY v. ITC Before we begin the argument today, and I'm waiting for one week. Glad you could make it today. This is a recurring problem for us, so it feels like we've been to this movie before, but maybe not for you as individual lawyers, and that is the extent to which there's been a confidentiality marking in the briefs, which makes it very difficult for us to delve into questions. It makes it difficult for us to write an opinion which we think would be fulsome, clear, and respond to the issues. And it's not obvious to us, it may be to the party, so we'd like to hear from you as to why all of those confidentiality designations are required. I'd like to add something to that. I think that not only does it appear that the briefs are overmarked with confidentiality markings, but some of the markings just make no sense. I mean, text will be marked as confidential, followed by a diagram that clearly describes in pictures what the text says in words. Some of it just is not reasonable. It doesn't make practical sense as to why you would mark something confidential, and then in the next couple of lines, divulge the very same information. So could you all speak to that in terms of whether you have reviewed it recently and whether you adhere to the confidentiality designations, or whether you're prepared to waive them at this point, or what? Yes. May it please the Court, Edward DeFranco for Pell and Motorola. No, I'm not starting the time. We're talking about this preliminary matter, not to the argument now. No, no, no. I'd like to hear your response to our concerns about the arguable overmarking of confidentiality in the brief. Yes, Your Honor. To Motorola, it appears to be an Apple issue, but we're trying to respect the confidentiality of their information and their documents. Those were the designations we made. From our perspective, we don't have a problem with the record being open in terms of the general application or functionality of the products at issue. I think we're mostly dealing at a very high level. So from our perspective, it's respectfully more a question for Apple's counsel because we're open to having this be an open record. Mr. Davies, my next question. Good afternoon. This is an issue that I definitely take very seriously. It is an issue that Apple takes very seriously. It is an issue that, with all respect to Your Honors, we are hampered by this Court's rules and the practice of the ITC, which the default at this Court is that anything that is designated as confidential at the ITC is automatically confidential here. What then has to happen is a set of negotiations either with the other side, as in other Apple cases, or with a client. We have to figure out what can and cannot be designated. So we're very sensitive to it. I pay a lot of attention to it. In this particular case, we talked about it very recently, and as it happens, the details do matter. If there is an emergency, I apologize, but the details are confidential and they were kept confidential below. The mechanics of the way this very important system, this novel system of the Apple products, is appropriately kept confidential. But the fact that we have the designations here does not at all reflect that we treat the duty of the Court to write a public opinion. That may all be true, but we're still left in a situation in which, if I were to say to you, try drafting an opinion in this case without revealing any confidential information, I think you'd find that a daunting task. Would you agree with me? Well, any opinion would be a daunting task, Your Honor. We affirm Rule 36. I would welcome that result, Your Honor. I think the D.C. Circuit has written some fabulous blank opinions. Yeah, most of them are national security. That is not our practice, except in national security cases. Of course not, Your Honor. And in moot courts, we have practiced this very question, and we are capable of discussing this case in a way that doesn't— No, but we haven't practiced it, so this creates a minefield for us as well. I mean, I've been in this situation a few times now, and it's very awkward to have to mentally filter your questions as the argument goes on to make sure you don't trip over one of the 180 tripwires that you've laid for us in your briefs. This is—I mean, I know—what are we going to do? But we need for you to— have all the arguments on the issues that you've brought to us, and yet in order to do this in a public forum as we wish and we have here, it's going to require that we divulge your confidential information. And it's—some of the comments that we have is also to protect the confidentiality of the information that's vital to your interests. So how do we do that? Is that a rhetorical question? I mean, there are—I mean, I guess we could ask people to leave. We could discuss, and we could try to figure this out now, or we could—I don't know how to handle that. I mean, I don't have—I mean, I discuss these very questions with my clients, and their answer is the details of the operation of this product is important. So it's not a case of us—I mean, I know this court sees briefs, which is automatic. Parties don't think about it. But we've written about it in the Federal Circuit Bar Journal. We take it very seriously. In other cases, we actually tried to move and thought about moving. I know it's going to be a serious problem. It's not a case of Apple taking it not seriously. But in this particular case, as it happens, the details matter. Okay. I think we have your argument or your position. I'm assuming the government doesn't have any need to get involved in this. I know. You're right. We depend on what the parties felt confidentially have to expect under our measure of technical assistance. May I add one more? Yes, sir. I think from hearing that argument, it's obviously common, and this court knows, that as we go from the trial record to the record on appeal, things get focused and narrowed down. The record is much smaller. We're not talking about much detail in the specific documents that we need to address or consider on appeal. We're talking about a couple of sentences and some terminology. And I think that respectfully, a little different—I think there is an approach that we can take here. We can go back and focus down now the record that we have in the appeal briefs and do a second cut of what's confidential or not. Because, yes, it's hard to argue this at all without getting into confidential information. I'm uncertain whether I can use terminology in Apple's process. Well, I guess I'm not clear what you're saying. I mean, you had said originally you did this respecting what you view as Apple's views. Now they've represented their view as being stuff has to maintain—they have to maintain that confidentiality.  The starting point was the rules require respecting the IPC's record, which is large and voluminous. Everything that's confidential there must be maintained as confidential. What I'm suggesting is, as parties focus down their positions as we get to appeal, taking a second look at that, not just respecting what was designated below, but saying, look, now on appeal we have this issue. The products operate in this way. We're relying on this terminology. Is that truly confidential? Well, what I understand Mr. Davies to be saying to us is the answer to that question is yes, as far as Apple's concerned. And I would say I would ask them to reconsider that because some of the terminology that I would like to use in arguing an appeal, yes, we would have to close this courtroom to even say those words. I really don't think that matters. In other words, saying Apple has a list that's called— Well, I think we have your argument, and I think we understand what you're saying. Can I make one point? One minor point. Thank you. If it wasn't this, it would be fine. If it wasn't here, it would be fine. Well, you know, we're not—that's almost more difficult than drawing a bright line. I appreciate that you're trying to accommodate us, but at this stage of the game to sort of pick out one or two things makes our job even more difficult in certain respects. Could you just give us a moment? Given what Apple has said, I think we have a very difficult time to address the issue of pushing notifications, all of that. It's a complicated process, so I think we should have a— I'm sorry? If you don't understand what you're having trouble with, it's keeping you up, so they come around. Well, I— I don't know. You don't want to? Well, frankly, I think we could just sit here and listen to the arguments, and it's fine with us. I don't have a whole lot of questions. I don't have a whole lot of questions, actually. Well, then we don't need to answer the questions. Do you have anything that you would like to request that we discuss? I don't have a lot of ideas, no. Okay, I can look at it. Let's assume this, and let's say that we're not going to answer the questions that you've drawn. Well, I— I think that's—I think that's the purpose of all of our meetings. Yes. Well, I guess— Well, you can't answer this one. I can't answer it. You can't answer it. You can't answer it. You can't answer it. I don't—I don't know. I don't know. I don't know. Let's say that we'll have a—we'll get minutes to answer any last questions. If you do ask a question, and it's confidential, then we ask the parties to meet and inform us after you have drawn the argument, and we'll strive to go ahead and mark your confidentiality record. That's the best we can do. As you can tell, we're a little uncomfortable about how to proceed here, but we are going to proceed. And I just caution the parties, you know, if these arguments are subject to a transcript that becomes public information, we're going to try our best to respect the designations, as I'm sure you've moved in, that you are. If anybody makes any kind of an error, we hope that we would be alerted immediately so that we can take the necessary action. And leave it at that. Yes, Your Honor. I won't be offended if Apple's counsel cuts me off if I go too far. I'm going to do my best to hold Apple confidential information. Your Honor, there's, of course, one issue, one patent at issue on this appeal. It's the 333 patent. In very simple terms, the 333 patent is directed to controlling the Apple company and the effective delivery of data to applications on a wireless device from someplace. Counselor, you can answer a very preliminary question that I have. Yes, Your Honor. So, just in reading your arguments, are you arguing that registering or unregistering for push notifications is a change in accessibility as used within the claims? Yes, Your Honor, with respect to the Droid 2 device. Well, is that the same change that affects accessibility in installing or uninstalling an application? It is for all intents and purposes, Your Honor. We would say that the domestic industry issue rises or falls with infringement. So there is parity between the accused products and how they operate from the perspective of the claims and the domestic industry product, the Droid 2. The terminology is a little different, as you noted, but the operation is effectively the same, and the D.I. issue rises or falls with infringement. So very simply, the claim talks about a subscriber unit, which can be a mobile device like a cell phone, of course. With respect to Claim 12, that device maintains an application registry on the device itself, and it's a list of all software applications, for example, that are currently accessible to a device. And then the claim goes on to say, in response to a change, not in response to every change, of course, not in response to all changes, it says, in response to a change in the accessibility of an application, that is communicated to the network. Why is it communicated? It increases efficiency, of course. It would be inefficient to send all updated information to every subscriber unit on the network, to every cell phone. It would be a waste. So does a change, does that refer to all changes that deal with accessing an application, or is it a single change, or a single instance? We would say, Your Honor, this case is pretty unique. The law could not be the law of this court. That could not be more strongly in our favor, with respect to our position, that A means one, formal, black-letter law, Baldwin case. It's a rule. Even given the reference to the change in the following excerpt? Yes, Your Honor. As the cases, when you read the other cases we cite, KJC, Sandisk, O1, you read the rest of the claim. You look at the phrase, the use of A, the reference back to the antecedent. If we disagree with you on that point, is that the whole case? Is that in the case? No, You're wrong. Do you think that it has to be all changes? We would still say, if we win that, then the second issue drops out, which is, we say every change is communicated. At installation, those changes are communicated as well. Now, Apple has this lack of causation argument. This gets into the American Caldor case. They say that, well, on the front end, the change is not communicated because it doesn't happen when you, for example, decide to download an application on your iPhone, if you have an iPhone, from the App Store, for example. They say that, well, that change is not communicated in response to, there's no direct causation required by the claims. We say, first of all, there is a direct causation. Apple documents, for example, to say that, you know, the normal practice, of course, when you use a phone, you decide to download an application, install it on your phone, you launch it right away. At that launch point, that's when, in very general terms, the information is sent back to the network, in terms of whether or not this application is going to get pushed. But typically, these things are temporarily associated. It doesn't get you there, does it? I mean, I typically put the key in my car after I get into the car and sit down. But that doesn't mean that getting into the car and sitting down starts the car. Well, that's correct, Your Honor. But the starting point, of course, is the claim language itself. We look at the claim language in response to. We have a pretty good example. I think the American Caldor case is a good example to take a look at. The starting point is the claim language itself. What is this claim trying to speak to? In American Caldor, you read through that claim talking about whether there's a problem with a vehicle. And it's a system for automatically figuring out, when you're in proximity of a service provider that can fix that problem, the system in the car notifies the user of that location. The same language in response to is in the claim in American Caldor. But when you read that claim, it's clear that that invention is talking about automation. It's talking about the system automatically completing that function. That's not the case here. This claim speaks to the opposite. Of course, we're talking about a user deciding to download applications. When is that application accessible? It's not accessible to, for example, the user decides to download it to a device. The claim speaks to user interaction. They want to use that in response to language. Suppose there's an application that expires over a certain time, and it stops functioning at that point. Is that application still accessible? Well, Your Honor, if an application is on my phone and it's no longer supported, notifications are no longer going to be sent. In other words, there's going to be something on the network side that's going to say that we're no longer sending notifications to that application because it's no longer available. At that point, it's not going to be currently accessible to the device, unless, I can't think of an example of this, but you might still be able to use a game or some other application, but it's not going to be updated. It's not going to receive notifications. That's an exceptional circumstance. I don't think it would set the rule in that case. That's an example where the user doesn't affect the accessibility of the application. That's right. And there are instances, though, where that information would automatically be sent back. Under my example, would that be a change in the accessibility of an application? I would say it wouldn't be a change in the accessibility. The application is still on the device. It's still accessible to the user. Now, if the application were deleted, for example, and as I said earlier, in both the accused products and the domestic industry products, that information is sent back to the network. The current accessibility is changed and that information is sent back. I did want to go back. Could I answer your question? Yes. I did want to go back for a moment to the approximate cause issue, the temporal aspect. And I think, again, to be clear, in reading this claim, the question is, is there a direct causation requirement? Now, first of all, that's the standard they set. And we say, yes, there is direct causation in this case. The user installing the application is what sets in motion the information being sent back with respect to current accessibility of that application itself. The user doesn't do that, of course. It's not going to happen. And, again, this claim speaks to user interaction at the outset. They do, both the ITC and Apple, try to do everything they can to focus on the fact that in certain circumstances, the user might decide not to launch a particular application immediately when they download it, although that's the normal practice. But, again, in response to, in this particular claim, does not require the level of direct causation, the immediate, without any gap in time that is seen in other cases such as AmeriCorps. Let's go back to the claim I have, which says, in response to a change, and you're saying a change can be one or more changes, and then to process about the language a little bit further down, it says control the transmitter to communicate the change. What does the change refer to? To a single change or any and all other changes? It's referring to the fact that the change itself is communicated to where. It's identifying the locations. The change is transmitted to the... What change? The, meaning the single one that affected accessibility? Yes, Your Honor. That particular change is referring to that instance, and that instance, when the change in accessibility occurs, that is communicated back to the network. Does that answer the question? Your Honor, there's, to overcome this A means every, as I said, the law is strongly in our favor, and Apple and the ITC, they must overcome this black letter law. They must show that the claim necessitates otherwise. They have to have strong evidence to show that A must mean every. They certainly don't have it. For example, Apple points to this current copy argument. They point to the specification, and they say, well, the specification talks about the application registry on the network and the server having to be identical, and that means in every instance, that each and every time, the accessibility must be sent back in order for that to occur. But there's a problem with that analysis. If you look at the summary of the invention, it's broken down into three pieces. A method for controlling a controller and the subscriber unit. Well, the first method, that first section of the summary of the invention is talking about Claim 1, Mirror's Claim 1. The second section is talking about Claim 7. In both of those instances, yes, those claims specifically have language that talk about the fixed portion of the network maintains the current copy. Claim 12 doesn't have that. Claim 12 talks about the subscriber unit, the registry on the subscriber unit being up to date. It doesn't require an exact mirror on the network side. That argument by Apple fails. They point to Figure 4 also. They say, well, Figure 4, if you look at that flowchart, that flowchart necessitates that it happens each and every time. Not so. That flowchart simply mirrors, again, the language of Claim 7. It uses the word A. It's just taking the claim and putting it in flowchart form. That has no impact. Last argument, Waiver. I'm not sure where this argument comes from, because it's clearly set forth in the record that our expert, in his direct witness statement at trial, said unequivocally that deletion is communicated back and the installation or deletion satisfies this claim limitation. Matter of fact, Apple commented on that theory in one of its briefs. It called this the part-time infringement theory. If you look to deletion alone, well, that shows that we raise the argument, certainly. There's no way to do it. You've started to get into your rebuttal time. Yes. I will save the last few minutes for rebuttal time. Thank you very much. Good morning, Your Honor. May it please the Court? I'd just like to remind the Court that this is a case about substantial evidence. This is not a claim construction case. Claim construction was never an issue below, and Motorola is raising claim construction for the first time on appeal. Substantial evidence supports the Commission's finding that neither the accused product nor the domestic industry product practices every limitation of Claim 12. Motorola asked if the Court traversed the Commission's finding, no violations, based on a claim construction and infringement argument never presented below. Claim 12 recites the subscriber unit, having a processing system that is programmed to perform three functions. And all of these limitations are intricately connected and very difficult to parse them out without looking at them all as a whole. First, the subscriber unit must maintain an application registry comprising lists of all software applications that are currently accessible to the subscriber unit. Motorola never argued that the list can be maintained for all applications without keeping track of when the applications are both installed and deleted. Secondly, in response to a change in accessibility, the subscriber unit must update the application registry. And again, Motorola never argued below that the accused product satisfied this limitation whenever an application is added or deleted from the registry. Quite correctly, Motorola said that this update must occur every time that there is a change in accessibility so that the list may contain all available applications. And then lastly, the subscriber unit must control the transmitter to communicate this change to a fixed portion of the network in order to notify the network whether or not it should receive data relevant to that newly added or deleted application. And again, Motorola never argued below that the user's decision regarding push notifications is itself a change in accessibility. That was news to me when I heard him say that. They instead relied on this but-for causation argument between installation of push-enabled applications and the user's acceptance or rejection of push notifications. But as Motorola's own expert testified, those two events are not intrinsically connected. And he said this very clearly at page 13552 of the record, pages 1075-77. And again, as with updating the application registry, Motorola never previously questioned the premise that all changes in accessibility must be communicated. Instead, Motorola argued exhaustively before the commission that communication of the change in accessibility due to installation is in fact satisfied. Motorola mentioned deletion only as a corollary of what must occur when there's an application that's installed. And when the commission found that Claim 12 was not satisfied for installation, now Motorola has no choice but to simply rely on deletion. And so as a result, Motorola argues for the first time on appeal that in order to fringe Claim 12, the subscriber unit does not have to satisfy the communicate-the-change limitation when an application is installed and therefore newly accessible to the subscriber unit. But Motorola's argument is based on two incorrect assumptions. And the first is that the commission actually found that the transmission sent by the accused Apple product after the deletion of an application  The commission actually never made that finding. What the commission did was it disagreed with the AOJ's conclusion, as Motorola's counsel pointed out, that Claim 12 requires the fixed portion of the network to maintain a copy of the application registry. And the commission agreed with Motorola that that was not required because of claim differentiation. Claims 1 required that, but Claim 12 did not. The commission then did not address the question of whether or not the transmission that occurs once the user decides to or not to accept push notifications satisfies the communicate-the-change limitation. Instead, it focused and agreed with the AOJ's findings that acceptance or rejection of push notifications is done in response to a change in the user's preferences and not in response to a change in the accessibility. Counselor, let me ask you a question about the domestic industry issue. You just said that below the ITC did not make any claim construction determinations, that this is not about claim construction. Correct, Your Honor. It seems, though, that you have to have some sort of claim interpretation at minimum in order to make a determination as to the technical prong of the domestic industry standard. Correct, Your Honor. Well, the point is that the specific limitation that they're really focusing... The limitation that's really issued is in response to, and no party ever... The AOJ found that in response to should get its ordinary meaning, and no party ever... But that's a claim construction determination. Yes, Your Honor, but that's not an issue on appeal. Even now, they don't argue that in response to means in response to. They're trying to say that... The argument that they did make below, which they make now, is that what is the trigger for the communication to be sent. The Commission found that the trigger, as the claim requires, is the change in accessibility. And they're saying that's not the case. That the trigger can be, oh, yes, there's a change in accessibility, but then there can also be some other stuff that may contribute to the trigger. But as Your Honor, just Bryson pointed out, your car example was perfect. The fact that you may have to sit in the car to then turn on the car is not the trigger for turning on the engine. The trigger, what the engine turns on in response to, is the key turning. And here, the claim requires that in response to is to the change in accessibility, not to some intervening user step, which may or may not occur at the same time or days later, as even Motorola experts stated. It could occur days later, after the application's installed. So, again, Motorola's other mistake is its presumption that the Commission found that even if the Commission found that post-deletion transmission communicates the change, that the accused product need not also communicate the change, again, in response to the installation of an application, as is explicitly required by Claim 12. But before this appeal, Motorola fully agreed that Claim 12 must be satisfied for both installation and deletion. And they certainly never argued that accused products could infringe Claim 12 if they are not capable of communicating the change in response to installation of an application. So, Motorola now argues this communication applies to the policy claim construction, again, but they never advocated for any construction of the in response to limitation. And furthermore, after the AOJ found this limitation not met, Motorola never argued to the Commission that there was some problem with the AOJ's interpretation in response to it. Rather, they only argued that, again, that the installation of the application is the but-for cause, understanding that installation is, A, important, and that there must be some connection with installation with the claim. So, again, and I just may turn briefly to the domestic industry issue. The Commission found Motorola's product does not practice the communication for many of the same reasons it found that there was no infringement. And specifically, the Commission found there is an insuspect cause and effect relationship, meaning that there is no trigger, between the change in accessibility and the sending of the registration intent which the Motorola product sends in order to indicate that the user should start accepting push notifications. Instead, the evidence shows that Motorola's project sends this registration intent only when the user first uses the application, not when the application is installed and not when there is a change in accessibility. Your Honor, do you have a question? Thank you. May it please the Court. Perhaps I should begin with domestic industry, Your Honor, because I think this Court recently has started emphasizing that is a threshold determination. So I do think it's a good place to start. And here we have a decision by the IPC... If we affirm on a domestic industry, we don't have to decide the other issue. That's what you're saying? That is what I'm saying, and not to bring it up again, but also that would not affect any confidentiality issues that we heard from Motorola's counsel on that. So the domestic industry requirement, I mean, you're familiar with the statute, and there were really two solid reasons why Motorola just failed to do what they needed to do to get the proceedings of the IPC going. The first is the one that we just had this Valentine on, is that the way that the Motorola system works, it just doesn't work in response to changes in accessibility. It responds to what a user wants. Does the user want this particular application to get data or not? And that's the way these modern systems work. That's the way Apple systems work. The way the patent is set up is much more focused on the way the unit itself works, not the desires of the user. We heard a lot about that one. But the ALJ also found, and to me this is the most straightforward one, is if you look at the claims, it requires that all the changes be kept on the list. And there's no dispute, none dispute at all, that what we have in the DROID is a list. The only list that Motorola points to is the app tray. The site for that is A3238. That's where they say that's the list. And it's not disputed that that list does not include this live wallpaper, which is an application. So we have a claim that says you have to list all software applications on your registry. It's undisputed that the registry here, the only one they point to, which is the app tray, does not include an application, the live wallpaper. And there's nothing in their reply, their response to that. They talk about the picker, but we're talking about the live wallpaper. So that's just a very easy one. Same with web applications. You put on your phone a web application, download it on the phone. That does not show up on their app tray. But it's clearly an application, but that's not disputed anymore. But it's not on the tray. Okay, so the ITC on that very specific point thought that other lists mattered, but that's not the argument that's been advanced, and it's not the argument Motorola advances. So that, to me, is two very straightforward ways to affirm the result here. I'm happy to talk about the merits. I mean, I can respond to the case law. Just one point on the case law. The cases are not quite as direct and clear. And just to be quick, obviously the governing principles here are Phillips. What really matters are what's in these particular claims. The cases that my colleague on the other side referred to almost all have different parts of their specification or different purposes. Those cases are really about whether A means one or does it mean more than one. They don't really have anything to do with this all, any. There's certainly no claim term that has the word all in it. There's certainly no purpose that requires it to make sense, but that becomes a decision. If you have a patent that way, you probably know the patent well enough that this won't be necessary. But Column 5 of the patent has a paragraph on Figure 4 and a paragraph on Figure 5. Figure 5 or Figure 4? Well, both. It has Figure 4, and then down toward the bottom of the column is the description of Figure 5. Does the description of Figure 4, is that only directed to Claim 12? Does Figure 5 apply to Claim 12? Or do Figures 4 and 5 both apply not only to Claim 12 but also to other claims in the patent? Because Motorola made an argument that the description of Figure 4 here or was it Figure 5? I think it was Figure 5 applies to some of the earlier claims. What's your position on that? It's a complex question, but I think you can sort it out. I know where you're headed, Your Honor. And actually, fortunately, the specification is clear. If we go to Column 5, Figure 5, which is at line 49, is about the controller. And the controller is part of the fixed portion. You don't have the control of any mobile device. Figure 4, and I'm at line 24 and 25, is about the subscriber unit. And Claim 12 is about the subscriber unit. So it matches up very nicely. Figure 5 is neither here nor there if you're just focusing on the claimed language of Claim 12. My follow-up question is, the language that's in the description of Figure 5 that says the current copy is updated in response to communications from the subscriber unit whenever the subscriber unit updates its application registry. You say that does not apply to Claim 12? We don't need that. We don't need to point to that part of the spec to make the argument. You don't need to. No. But... I mean, I think that goes to the philosophy of how technically we're going to read spec versus the claims. And, you know, I think people can approach that differently. Does it... I'm not sure what... I mean, we have all we need in Figure 4, but if you look at Figure 4... All right. So you're saying don't... That's up to you, Your Honor. I'm just saying... I want to know what you think we should do. Okay. Well, I can answer that. I definitely agree that what matters with patents is what the person was trying to invent, and you should really look at the entire spec, read the claims in light of that. Right. And so I would be more drawn to looking at it, but, you know, there are certain rabbit holes one doesn't get to go to sometimes, and this seems like an appropriate time to do so. Thank you. Your Honor, I would agree that there is a mapping in the spec, as we discussed earlier, between specific portions and the claims themselves. That section with respect to Claim 7 does talk about whenever and every instance. Now, ITC's counsel said, well, we're not talking about claim construction issues here. I think we, in fact, are, because the way that the commission applied a must mean every and every time, the way it applied the in response to and direct causation was basically applying claim construction. That was the commission's interpretation of the claim. There's no support in this specification to say a means every. In the very portion that you pointed out, Figure 4, Claim 12, it's got no requirement of whenever. It's got no language in there that speaks to a being every. It says the opposite. It talks about a change. To answer an earlier question, I do have a cite with respect to the later use of the claim of the word the to refer back to the use of the word a, and in the Sandisk case at 695, F3rd 1360. I'll read this in very briefly. It says, In Baldwin, we explained that the later use of the and said to refer back to an earlier claim term does not limit that claim term to the singular, and we also articulated the general rule that the use of the indefinite articles a and or n means one or more. So, in other words, it's just referring back to that particular instance. It doesn't mean that that has to be plural if it starts speaking in language of the later on in the claim. With respect to the claim construction issue, again, on currently accessible, that was an issue that the commission specifically asked for additional information on, and that language is very telling. The language that the commission adopted after both parties, and Apple has distanced himself from this language, of course, that both parties agreed in the supplemental briefing to the commission that currently accessible means both installed and authorized or enabled for use on a device. They backed away from that language because enabled for use speaks to and feels like user interaction when it's enabled, when it's launched. They didn't like that language. They don't like it anymore. The commission, after hearing that proposal, adopted available and enabled. Again, the word enabled for present use by the subscriber. Speaking to launch. Speaking against this temporal requirement that they're trying to force fit into this claim that is not supported by the claim language here as it was in the American Caldor case. Briefly, in the last 20 seconds, the live wallpaper example, that just does not fit. It's an R Varki example. Live wallpapers are not apps, so they get away from that. Apple gets away from that now, and they talk about the live wallpapers themselves. There is an app. It's called the Live Wallpaper Picker. The commission properly found that was part of the registry. Can't look under the hood and talk about a particular wallpaper and make some requirements and say, well, each wallpaper has to be on the registry. The commission did the right thing. It found the Live Wallpaper Picker is part of the registry. That's the beginning and the end of the inquiry on that issue. Any other questions? We thank both parties for cases submitted. That concludes the proceedings.